IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>ONE BLACK ANDROID CELLULAR PHONE SEIZED FROM ZALMAN GOLDBLATT. | Case No. 2:25-mj-00453 DBP<br><br>AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT<br><br>Judge Dustin B. Pead |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Sergio Guerra, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I am a Special Agent (SA) with the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) and have been so employed since August 2010. I am currently assigned to the HSI Salt Lake City, Utah, office and concurrently assigned to the Utah Internet Crimes Against Children (ICAC) Task Force, managed by the Utah Attorney General's Office. My formal law enforcement training includes successfully completing the HSI Special Agent Training course and Criminal Investigator Training course at the Federal Law Enforcement Training Center. I have received additional training from the ICAC, and other sources related to Child Sexual Abuse Material ("CSAM"), to include child pornography (as defined in 18 U.S.C. § 2256), and exploitation investigations and specifically to online, undercover enticement.

2.      I have investigated and or been involved in investigations of federal criminal violations, including those related to the distribution, receipt, and possession of CSAM, child enticement and exploitation, and cybercrime. I have reviewed numerous examples of CSAM. I have become familiar with ways that CSAM is shared, stored, distributed, and/or produced, including the use of various social media websites (Facebook, Instagram, Twitter, Kik, Snapchat, Discord, etc.), messaging platforms and applications, electronic media storage, "cloud" based storage (Dropbox, Mega, Box, iCloud, etc.), and peer-to-peer ("P2P") networks. I have also become familiar with jargon or slang terms that people involved in child exploitation use to discuss their activities. I have gathered evidence pursuant to search warrants and have participated in searches of premises, persons, and electronic devices. I have reviewed online conversations with, and upon arrest, have interviewed persons who possess, view, and distribute CSAM or who seek to commit physical sexual offenses against minors.

3.      As a federal agent, I am authorized to investigate violations of laws of the United States, and I am a law enforcement officer with the authority to execute warrants issued under the authority of the United States. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of a residence described in Attachment A.

**PURPOSE OF THE AFFIDAVIT**

4.      I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of a black Android cellular phone ("SUBJECT TELETPHONE") (described in Attachment A), seized from Zalman Ber GOLDBLATT's ("GOLDBLATT") pursuant to his arrest, for fruits, evidence, and

instrumentalities of violations of 18 U.S.C. § 2423(b) (Travel with Intent to Engage in Illicit Sexual Conduct), 18 U.S. Code § 2422 (Enticement/Coercion of a Minor): 18 U.S. Code § 2252A (Transportation of Child Pornography, 18 U.S.C. § 2251(a) (Production and Attempted Production of Child Pornography), and 18 U.S.C. §§ 2252(a)(4) and 2252A(a)(5)(B) (Possession of Child Pornography), "collectively the SUBJECT OFFENSES," described in Attachment B.

5.    The statements in this affidavit are based upon my personal observations, my training and experience, and information provided by law enforcement officers. The statements in this affidavit do not contain all known information but rather only those facts believed necessary to establish probable cause for this search warrant.

## BRIEF SUMMARY

6.    As set forth in detail below, in approximately January 2025, GOLDBLATT used a cellphone to film himself engaged in sexual conduct with a 15-year-old girl ("Minor Victim 1" or "MV1") in Las Vegas, Nevada. In an unrelated case, GOLDBLATT traveled to Utah in February 2025 with his cellphone.  Between approximately February 24, 2025, to February 28, 2025, GOLDBLATT used online chat applications to communicate with someone he believed to be a 13-year-old female ("MINOR") living in Lehi, Utah.  In fact, he was communicating with the fictitious persona of a MINOR created by a law enforcement detective acting in an undercover capacity.  In their conversation, GOLDBLATT repeatedly detailed his desire to engage in vaginal and oral sex with the MINOR, and sent multiple photographs of an erect penis, which he stated was his own, to MINOR.   Ultimately, GOLDBLATT arranged to meet the MINOR in person for sex.  On February 28, 2025, GOLDBLATT traveled from Las Vegas, Nevada to Lehi, Utah to meet MINOR, and was arrested.  At the time of his arrest, GOLDBLATT was in possession of the

SUBJECT TELETPHONE and indicated to law enforcement that child pornography would be on the SUBJECT TELEPHONE.  As set forth below, there is probable cause to believe that evidence of the SUBJECT OFFENSES – related to both MV1 and MINOR - will be found on the SUBJECT TELEPHONE.

## JURISDICTION

7.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States … that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## DEFINITIONS

8.    Based on my training and experience, I use the following terms to convey the following meanings:

a.    "Chat" is any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

b.    "Child Pornography" includes any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction was a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted,

4

or modified to appear that an identifiable minor is engaged in sexually explicit conduct. *See* 18 U.S.C. § 2256(8).

c.      "Child Sexual Abuse Material" ("CSAM"): any use of the term "child sexual abuse material" or the acronym "CSAM" in this affidavit should be construed as a use of the term "child pornography" as defined is paragraph (a) above.

d.      "Cloud-based storage service" refers to a publicly accessible, online storage provider that collectors of depictions of minors engaged in sexually explicit conduct can use to store and trade depictions of minors engaged in sexually explicit conduct in larger volumes. Users of such a service can grant access to their collections by sharing links, and associated passwords, to their stored files with other traders or collectors. Such services allow individuals to easily access these files through a wide variety of electronic devices such as desktop and laptop computers, mobile phones, and tablets, anywhere and at any time. An individual with the password to a file stored on a cloud-based service does not need to be a user of the service to access the file. Access is readily available to anyone who has an internet connection.

e.      "Computer" refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." *See* 18 U.S.C. § 1030(e)(1).

f.      "Computer hardware" consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing

5

devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

g.     "Computer passwords and data security devices" consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

h.     "Computer software" is digital information that can be interpreted by a computer and any of its related components to direct the way it works. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

i.       "Electronic Service Provider" ("ESP") means any provider of electronic communication services or remote computing services.

j.       The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

k.       "IP" stands for Internet Protocol. Internet Protocol provides the methodology for communication between devices on the Internet.

l.       "Internet Protocol address" ("IP address") is a unique number that identifies a device on a computer network and is used by computers to move information on the Internet. Every device directly connected to the Internet must have a unique IP address.

m.       "Internet Service Providers" are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

n.       "Minor" means any person under the age of 18 years. *See* 18 U.S.C. § 2256(1).

o.       "Mobile application" or "chat application" is a small, specialized program downloaded onto mobile devices, computers and other digital devices that enable users to perform a variety of functions, including engaging in online chat and sending or receiving images and videos.

p.	The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); mechanical form (including, but not limited to, phonograph records, printing, typing); or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic digital media.

q.	"Remote computing service" is defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

r.	"Sexually explicit conduct" applies to visual depictions that involve the use of a minor, *see* 18 U.S.C. § 2256(8)(A), or that have been created, adapted, or modified to appear to depict an identifiable minor, *see* 18 U.S.C. § 2256(8)(C). In those contexts, the term refers to actual or simulated (a) sexual intercourse (including genital-genital, oral-genital, or oral-anal), whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic areas of any person. *See* 18 U.S.C. § 2256(2)(A).

8

s.       "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disk or other electronic means, which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## BACKGROUND ON COMPUTERS AND CHILD EXPLOITATION

9.       Based on my knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, I know that computers, computer technology, and the Internet have drastically changed how child pornography is produced and distributed.

10.       Computers serve four basic functions in connection with child pornography: production, storage, communication, and distribution.

11.       Child exploiters can upload images or video clips directly from a digital camera to a computer. Once uploaded, they can easily be edited, manipulated, copied, and distributed. Paper photographs can be transferred to a computer-readable format and uploaded to a computer using a scanner. Once uploaded, they too can easily be edited, manipulated, copied, and distributed. A modem allows any computer to connect to another computer via a telephone, cable, or wireless connection. Through the Internet, electronic contact can be made to literally millions of computers around the world.

12.       The computer's ability to store images in digital form makes it an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive or more recently, memory) used in home computers has grown tremendously in the last

9

several years. This storage can store millions of images at very high resolution. Images and videos of child pornography can also be stored on removable data storage media, such as external hard drives, thumb drives, media cards, and the like many of which are small, highly portable, and easily concealed, including on someone's person or inside their vehicle.

13.     Computers, including mobile devices (cellphones), and mobile storage devices are highly capable, with numerous uses, including mapping, communication, instruction, and playing entertainment media and are often expensive. Moreover, these high-capability devices and easily portable upon a person, in bags or luggage, or in motor vehicles, vessels, trains, or airplanes. As such, travelers frequently travel with computers, including mobile devices (cellphones), and mobile storage devices.

14.     The Internet affords collectors of child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion, including Internet Relay Chat, instant messaging programs such as Kik, bulletin board services, e-mail, "peer-to-peer" ("P2P") file-sharing programs such as LimeWire and eMule, and networks such as eDonkey, Gnutella, ARES, Tumblr, and BitTorrent. Collectors and distributors of child pornography sometimes also use online resources such as "cloud" storage services to store and retrieve child pornography. Such online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in a variety of formats. A user can set up an online storage account from any computer with access to the Internet and can access stored files using any device capable of connecting to the Internet. Evidence of such online storage of child pornography is often found on the user's computer.

15. An Internet Protocol ("IP") address is a unique identifier that electronic devices such as computers, routers, fax machines, printers, and the like use to identify and communicate with each other over a network. An IP address can be thought of as a street address. Just as a street address identifies a particular building, an IP address identifies a particular Internet or network access device. When a user logs on to his/her Internet Service Provider ("ISP"), they are assigned an IP address for the purpose of communication over the network. The Internet Assigned Numbers Authority (IANA) manages the IP address space allocations globally. Internet Protocol version 4 (IPv4) defines an IP address as a 32-bit number while Internet protocol version 6 (IPv6) defines an IP address as a 128-bit number. Both versions are currently in use on the internet. These IP addresses can be written and displayed in human-readable notations, such as 192.0.2.1 in IPv4 and 2001:db8:0:1234:0:567:8:1 in IPv6.

16. An IP address can be statically assigned, meaning the IP address does not change from one Internet session to another, or dynamically assigned, meaning a user receives a different IP address each time the user accesses the Internet. The frequency in which this address changes is generally controlled by the Internet Service Provider and not the user.

17. A "dynamic" IP address means that the ESP assigns a different unique number to a device every time the device accesses the Internet. A "static" IP address means that the ESP assigns the same unique number to a device every time the device accesses the Internet.

18. As with most digital technology, communications made from a computer are often saved or stored on that computer. Storing this information can be intentional, for example, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication may be automatically stored in many places, such as temporary files or ISP client software, among others. In addition to electronic communications, a computer user's

Internet activities generally leave traces in the computer's web cache and Internet history files. A forensic examiner often can recover evidence that shows whether a computer contains P2P software, when the computer was sharing files, and some of the files that were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

## RELATIONSHIP BETWEEN HANDS-ON CHILD SEXUAL OFFENDERS AND CHILD PORNOGRAPHY

19.    I know, based on my training and experience, and based on conversations I have had with others who investigate child exploitation offenses, that people who have a sexual interest in children, including persons who commit hands on sexual offenses against children, and particularly those who travel to commit sexual offenses against children, often collect and trade in child pornography. These persons receive sexual gratification from images and video clips depicting the sexual exploitation of children.

20.    I know that these persons may also use such images and videos to lower the inhibitions of children who they wish to sexually abuse, or to screen several children while seeking a possible victim. Such persons maintain their collections of child pornography in safe, secure, and private locations, such as their residence or vehicle, and on computers and digital storage media under their direct control. Such persons often maintain their collections, which are considered prized possessions, for long periods of time, and prefer not to be without their collections for any prolonged period. In some cases, however, persons with a sexual interest in children have been found to download and delete child pornography on a cyclical and repetitive basis, rather than storing a collection of child pornography indefinitely.

21.    I also know from my training and experience that many people who sexually exploit children often download child pornography from the Internet, and those who collect child

pornography, frequently save images and videos of child pornography on their computers and/or transfer copies to other computers and storage media, including cloud storage accounts, external hard drives, thumb drives, flash drives, SD cards, and CDs or DVDs. Moreover, it is common in child exploitation investigations to find child pornography on multiple devices and/or storage media located in suspects' homes, rather than on a single device.

22.     I know based on my training and experience that many social media and messaging platforms, such as Facebook, Instagram, Twitter, Snap Chat, Kik messenger, and others can be directly accessed and used with one's cellular phone. Often, these applications require the user to download the application directly to their phone, which then allows seamless use between the cellular phone and the social media or messaging website.

## BACKGROUND ON CHAT APPLICATION A[1]

23.     Chat Application A is an anonymous chat application for mobile devices such as tablets and smartphones. Users can connect and chat with others based on their location and or other criteria the users set as their preferences. Social Media Platform A advertises itself as the ultimate anonymous chat app, allows users to connect and chat without revealing their identity.

24.     Users can also exchange images, videos, and other files with each other; however Social Media Platform A is designed to be anonymous and short-lived, with the intention that private messages and photos are deleted after a short period.  The app specifies that photos are automatically deleted 10 seconds after being opened by the recipient.

---

[1] Chat Applications A, B, and C are known to law enforcement and are intentionally omitted to protect ongoing investigations on those platforms.  The name of the chat applications will be provided to anyone assisting in the search of the devices and to the Court upon request.

25.     Users are allowed to contact other users by sending a request.  Once the other user accepts the request then both users are able to communicate through direct message.  Social Media Platform A's terms of service indicate the minimum age is 18 years, however there is no mechanism in place to verify age claims.

### BACKGROUND ON CHAT APPLICATION B[1]

26.     Chat Application B is a messenger application for mobile devices such as tablets and smartphones.  Chat Application B advertises itself as an end-to-end encrypted messenger that minimizes sensitive metadata, designed and built for people who want absolute privacy and freedom from any form of surveillance.  Some other benefits Chat Application B advertises; accounts are completely anonymous, no phone number or email is required; the application doesn't collect data therefore nothing can be leaked; and messages are sent through its onion routing network and leave no trace.

### BACKGROUND ON CHAT APPLICATION C[1]

27.     Chat application C is a cloud-based, cross-platform, social media and instant messaging (IM) service.  It allows users to exchange messages, share media and files, and hold private and group voice or video calls as well as public livestreams. It is available for Android, iOS, Windows, macOS, Linux, and web browsers. Chat Application C offers end-to-end encryption in voice and video calls, and optionally in private chats if both participants use a mobile device.  To start using Chat Application C, a user must sign-up with their phone number.  Upon signing up, messages sent and received by the user are tied to their number and a custom username, not the device. Any Chat Application C content is synced between the user's logged-in devices automatically through cloud storage.

**STATEMENT OF PROBABLE CAUSE**

A. *GOLDBLATT Communicated with MINOR About Meeting for Sex*

28.     On February 24, 2025, a law enforcement detective was on Chat Application A, in an undercover capacity posing as a 13-year-old minor female (MINOR).  That day, MINOR received a chat request on Chat Application A from someone using an account identified only by the username/emoji depicting a purple smiley face with horns.  This emoji is commonly used to convey mischief and or naughtiness.  As set forth below, the user of this account has been identified as Zalman Ber GOLDBLATT.

29.     MINOR accepted GOLDBLATT's chat request, and began to chat with GOLDBLATT on Chat Application A.  From the outset, MINOR made it clear she was only 13 years old.  GOLDBLAT asked MINOR, "When did you turn 18?"  MINOR indicated that she was only 13 years old, stating, "Is it okay if I'm 13."  GOLDBLATT was undeterred, responding, "Yes I am very okay with that."

30.     GOLDBLATT then quickly turned the conversation to sex.  When MINOR asked GOLDBLATT what he was doing, GOLDBLATT responded, "Laying in bed masturbating lol."  GOLDBLATT made it clear that he wanted to have sex with MINOR, and that he was willing to drive six hours from Las Vegas, Nevada to Lehi, Utah, to make this happen.  When MINOR asked if he would really ever visit her in Utah.  GOLDBLATT responded, "Probably but I Would have to be very careful.  Would you be ok with having sex with me"?  MINOR asked why they would have to be careful.  GOLDBLATT responded, "Because I don't want either of us to get caught and to get in trouble".

31.     Despite this clear indication that GOLDBLATT understood MINOR was 13 years

old and that what he was contemplating was illegal, GOLDBLATT persisted.  Between February 24 and February 28, 2025, GOLDBLATT graphically discussed sexual matters with MINOR.  For example:

- GOLDBLATT asked MINOR if she had ever engaged in sexual intercourse. MINOR said no.

- On multiple occasions, GOLDBLATT sent MINOR photos of his erect penis. Once he followed this with, "it's ready for you."

- GOLDBLATT said he would bring her a present because, "Of course, if you're going to let me kiss   you and touch you and have sex with you. Of course, I would bring you a present".

- GOLDBLATT stated, "I will definitely have sex with you and other things with you like playing with your tits lick your pussy and have you suck my dick".

- GOLDBLATT asked, "Have you gotten your period yet?"  When MINOR responded she had not, GOLDBLATT responded, "No, that's good that means I won't have to wear a condom.  Yes, it feels much better without a condom. I'm not super bit so it might hurt a little but it shouldn't be too bad if it does. But that's only for sex.  Everything else i do to you will be pleasure.  Do you masturbate?  So you have never put anything in your pussy not even fingers? We will try it with my fingers and see if it hurts you.  I don't want you to be in to much pain.  So we may not have sex the first time and just play and do other things."

32.    GOLDBLATT also attempted to get MINOR to send him sexually explicit images

16

of herself.  Once, after sending a photo of his own penis, GOLDBLATT requested a "naughty" photo from MINOR.  Based on my training and experience, and in the context of the conversation, GOLDBLATT was asking MINOR to send him child pornography. MINOR declined to send GOLDBLATT a "naughty" picture, explaining that she had sent such pictures to a different adult man when she was 12 years old.  She said she had been caught, and punished by her mother and police.  Indicating that he clearly understood sexual activity with a minor is illegal, GOLDBLATT asked if the adult male MINOR spoke of was jailed as a result.  Another time, GOLDBLATT tried to convince MINOR to send a photo of herself in her bra and underwear, saying attempted to obtain a photo of MINOR's underwear and bra saying that it wasn't so bad, it's like wearing a bikini.

33.    GOLDBLATT repeatedly made it clear he understood MINOR to be 13 years old. For instance:

- GOLDBLATT asked "When did you turn 13?"

- MINOR what color of underwear and bra MINOR was wearing. When MINOR said her underwear was white, GOLDBLATT responded, "White could be sexy especially if they're on a beautiful 13-year-old girl?"

- GOLDBLATT asked, "What grade are you in?  And can you get away from home for hours at a time without getting in trouble?" MINOR responded, she was in the 7th grade and that she could lie about being sick and stay home,

34.    At the same time GOLDBLATT was making plans to meet MINOR for sex, he was also making plans to protect himself.  When he first sent a photograph of himself to MINOR, he actually sent a photograph of someone else.  He said his name was "Tim."  It was not.  He said he worked in a grocery store – in fact, he used to work in a grocery store but no longer did.  He also

asked MINOR for proof that she was really a 13-year-old. "Can I ask you for a huge favor? Would you be willing to take a custom picture for me? I'm just a little worried and ease my mind that you're actually real. It's not that I don't trust you. It's that I'm taking a big risk because you're 13 and I'm driving a long way I don't want to pull up and have cops there or you to be somebody else. Would you be willing to write on your arm I'm 13 and make a piece sign. If you're actually thirteen and a real girl and you don't tell anybody about me. I will not get in trouble. I really want to have fun with you though and I definitely want to see you naked so if the only way to do that is to meet you, I am willing to take the risk as long as I know you are. Your arm with it written, a piece sign and your face so I can see it's you." Based on my training and experience and the experience of other law enforcement that it is very common for individuals using the internet to attempt to have sex with minors to ask for this kind of proof to ensure the minor is real, and not actually police pretending to be a minor.

35.     MINOR sent a black and white photo, digitally altered to appear to be a 13-year-old girl making the peace sign, with the words "I'm 13" written on her arm. GOLDBLATT responded, "Oh my God, I'm so happy. I am definitely going to try my hardest to come to you this weekend."

36.     After MINOR sent GOLDBLATT a "proof of life" photograph so he would know she was a real 13-year-old, MINOR asked that GOLDBLATT reciprocate and send a similar photo, GOLDBLATT complied. This time, he sent a photograph of himself. MINOR asked GOLDBLATT if he could send the photo again so she could save it. GOLDBLATT responded, "If I'm being honest I would rather you not save it. I don't want my picture to be found on a 13 year old's phone. But if you really want to I will. I'm glad you understand. Especially after what

you told me that happened to you when you were 12. I'm glad you want to protect me. I really want to play with you. I'm hoping to play with you as many times as I can for many years. Do you know of any hotels near your place? Okay good because I definitely want to get a room so I can enjoy you as much as I can. Yes, I'm getting hard just thinking about you and what we're going to do together."

37. GOLDBLATT continued to express concern that he would be caught because she was only 13 years old, but still worked out the logistics to meet that weekend for sex:

- "I'm still worried about the drive and the fact that you are 13 but it will be ok". MINOR let him know he didn't have to come. GOLDBLATT responded, "Of course I don't have too but I want to see you so it will be worth it I believe. You are beautiful and willing to get naked with me."

- GOLDBLATT later stated, "And it's not a bad thing to be cautious when you're planning on meeting an underage girl especially from an anonymous app lol. I'm sorry I just don't want anything bad to happen to either of us.

- "What I might do if I can I might leave friday afternoon straight from work. Would you be able to leave your house 0 o'clock at night. Your mom won't get suspicious or worried. Do you want me to go straight to the hotel or to pick you up from your house."

- "I really want you. Please be real and not a cop and meet me lol. Yes I will leave rigth after work. I hopefully will get there between 9 and 10 if all goes well."

38. GOLDBLATT and MINOR made plans for MINOR to leave her house and walk to a nearby church where GOLDBLATT could pick her up. GOLDBLATT worried that the only means

19

they had of communicating with each other was Chat Application A, and was concerned that their chat would somehow get banned before he arrived. Based on my training and experience, GOLDBLATT was likely afraid Chat Application A would somehow realize that he was using the app to communicate about sex with a minor and shut off his account. MINOR offered to provide her contact information on a different app, Chat Application B. GOLDBLATT and MINOR agreed to maintain communication on both, Chat Application A & B.

39.    GOLDBLATT left no doubt about the purpose of his trip. He sent a photo of his erect penis, stating, "tomorrow night you are going to have it in your mouth and are going to lay on top of it. Plus I will be helping you and teaching you what to do. And I will enjoy your body so much. I will touch it and play with your body with my hands and mouth. Then I hope to have sex with you if it's not to painful. Ok baby I am very good with that I really want to be inside of you. I might be getting there really late if there is bad raffic so I don't want to waste the room I can always sleep in my car and get the room for Saturday that is my thinking. No we would have fun in the car and have a bed and sex on Saturday".

B.  *GOLDBLATT Was Arrested in Lehi, Utah, Trying to Meet MINOR, and the SUBJECT TELETPHONE Was Seized*

40.    On February 28, GOLDBLATT let MINOR know that he was coming that day. Later, he updated MINOR that he was three hours away. He told her that he would stop and book a hotel room before meeting MINOR.

41.    That evening, surveillance saw a dark colored Hyundai SUV bearing a Nevada license plate arrive at a motel in Lehi, Utah. A man matching the description of GOLDBLATT was observed exiting the motel. At around the same time, GOLDBLATT messaged MINOR, "Yes

I just got to the motel I'm walking in and getting a room fright now.  It was quicker to get the room than I thought".

42.     Shortly thereafter, the man left the hotel, returned to his car, and drove away in the direction of the meet location.  Shortly thereafter, surveillance at the meeting location saw GOLDBLATT pull into the meeting location.  GOLDBLATT messaged MINOR, "I'm here."

43.     At that point, GOLDBLATT was arrested by Lehi police. At the time of his arrest, GOLDBLATT was in possession of the SUBJECT TELEPHONE, which was seized.

44.     During a post-Miranda interview, GOLDBLATT admitted that he was the person communicating with MINOR, although claimed that he believed he was meeting an adult, and that the chat about her being only 13 years old was just role playing.   He also admitted that police would likely find pornography on the SUBJECT TELEPHONE.  When he was told that they did not care, as long as it was adult pornography, GOLDBLATT said he is "probably going to jail." He said he has a lot of porn and "probably" has a lot of underage point without even knowing it.[2]

C.   *There is Probable Cause to Believe That GOLDBLATT Used the SUBJECT TELEPHONE to Produce Child Pornography With a 15-Year-Old Girl In Las Vegas*

45.     On January 12, 2025, the Las Vegas Metropolitan Police Department (LVMPD) received a call regarding a 15-year-old girl hereinafter referred to as MINOR VICTIM 1 (MV1).[3] MV1 reported that she had met a 34-year-old male online.  She only knew this man only as "Tim," but as set forth below, "Tim" has been identified as GOLDBLATT.  (Note that "Tim" is the same name GOLDBLATT used to identify himself when communicating with MINOR.)

---

[2] Utah state law enforcement conducted a search of the SUBJECT TELEPHONE, but nothing in this probable cause statement relies on the results of this search.

[3] The true identity of MV1 is known to law enforcement and is intentionally omitted to protect the victim's privacy. The name of MV1 will be provided to anyone assisting in the search of the devices and to the Court upon request.

46. MV1 initially told LVMPD that she had lied to "Tim" about her age, telling him she was 18 years old. Later, however, MV1 admitted that she had told "Tim" she was in fact only 15 years old. MV1 stated she had had sexual intercourse with two men, "Tim" and a second adult male ("Male 2"). She said she had sex with the men in order to stay at Male 2's house for the weekend.

47. On February 2, 2025, MV1 was forensically interviewed. MV1 stated she initially met Tim (GOLBLATT) online, using an application that allows the user to communicate with other random users based on geographic location. She did not recall the name of that application but said that Tim (GOLDBLATT) later instructed MV1 to download Chat Application C to communicate with him. MV1 and Tim (GOLDBLATT) often used Chat Application C to communicate.

48. MV1 said she had met Tim (GOLDBLATT) in person, and they had had sex. MV1 described Tim (GOLDBLATT) as a Jewish, 36-year-old white male, 6'00" tall, brown hair, beard, and tattoos. This matches GOLDBLATT's physical description.

49. MV1's phone was searched by LVPD. Among other things, a video was found showing GOLDBLATT engaged in sexual activity with MV1 was found (the "VIDEO"). The VIDEO is 4 minutes 44 seconds long and has a Last Modified Date of January 5, 2025. It appears to be associated with Chat Application C. The VIDEO appears to be recorded from the GOLDBLATT's vantage point. MV1 is topless, exposing her breasts, while GOLDBLATT is wearing no pants or underwear and his penis is exposed. During the VIDEO, GOLDBLATT orally sodomizes MV1's mouth with his penis, rubs his penis between MV1's breasts, stimulates his own penis with his hand, then ejaculates into MV1's mouth. During the VIDEO,

GOLDBLATT can be heard asking, "How old are you?" MV1 responds, "15".

50.    GOLDBLATT's face is not visible in the VIDEO. However, the adult male in the VIDEO is white, with visible and distinctive tattoos – he has the tattoo of a "V" with a small circle tattooed below the "V," and a picture of an open book tattooed above the "V." Photos taken during his interview with the Lehi PD show that GOLDBLATT has similar tattoos on his left wrist/forearm.

51.    After the VIDEO was found, MV1 was forensically interviewed again. MV1 was shown a driver's license photo of GOLDBLATT, and positively identified him as "Tim." She identified the male in the VIDEO as GOLDBLATT and said that GOLDBLATT recorded the sex act using his cell phone. MV1 further stated the VIDEO was recorded at GOLDBLATT's brother's house. MV1 stated that after recording the sex act, GOLDBLATT sent the video to MV1 via Chat Application C.

D.    *There is Probable Cause to Believe That Evidence of the SUBJECT OFFENSES will be on the SUBJECT TELETPHONE*

52.    As set forth above, there is probable cause to believe that GOLDBLATT used the SUBJECT TELETPHONE to communicate with MINOR, who he believed to be a 13-year-old girl. During these communications he attempted to entice, persuade, coerce, and induce her to engage in sexual activity with him. He also attempted to persuade her to take and send him child pornography. He then travelled in interstate commerce from Nevada to Utah for the purpose of engaging in criminal sexual activity with MINOR. Thus there is probable cause to believe the SUBJECT TELEPHONE is an instrumentality of, and contains evidence of, the offenses related to MINOR. Such evidence could include GOLDBLATT's communications with MINOR,

23

evidence of his use of Chat Applications A and B, the photographs that were sent to MINOR, and geolocation data of GOLDBLATT prior to and during his travel to meet with MINOR.

53.     Further, when arrested, he told Lehi police that there would be significant amounts of pornography on the SUBJECT TELETPHONE, and that this would include child pornography. Based on GOLDBLATT's apparent sexual interest in children and images of children, combined with his statement that there will be child pornography on the SUBJECT TELETPHONE, there is probable cause to believe that the SUBJECT TELETPHONE is an instrumentality of/and will contain evidence related to the possession, transportation, distribution, and receipt of child pornography (CSAM).

54.     Finally, as set forth above, there is probable cause to believe that GOLDBLATT used his cellphone to produce child pornography depicting 15-year-old MV1 in Las Vegas in approximately January 2025. Approximately a month later, when he travelled to Lehi, Utah, from Las Vegas, GOLDBLATT brought his cellphone with him (the SUBJECT TELETPHONE) and used it to communicate with 13-year-old MINOR about meeting for sex. It is more likely than not that the SUBJECT TELETPHONE seized from GOLDBLATT in February is the same phone he used to produce child pornography with MV1 in January, and that there will be evidence of this offense on the SUBJECT TELETPHONE. Even if the SUBJECT TELETPHONE is not the same device used to produce the VIDEO, there could be other evidence related to the VIDEO on the SUBJECT TELETPHONE, such as copies of the VIDEO, evidence related to chat applications used by GOLDBLATT to communicate with MV1 and to send her the VIDEO, such as Chat Application C, images of GOLDBLATT and his tattoos, images depicting his brother's home where the VIDEO was reportedly taken, and geolocation

data that could place GOLDBLATT at the location of the VIDEO at the date and time the VIDEO was made.

## SEARCH AND SEIZURE OF DIGITAL DATA

55.    This application seeks permission to search for and seize evidence of the crimes described above, including evidence of how computers, digital devices, and digital storage media were used, the purpose of their use, and who used them.

56.    Based on my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that data in digital form can be stored on a variety of systems and storage devices, including hard disk drives, floppy disks, compact disks, magnetic tapes, flash drives, and memory chips. Some of these devices can be smaller than a thumbnail and can take several forms, including thumb drives, secure digital media used in phones and cameras, personal music devices, and similar items.

57.    I know from my training and experience, as well as from information found in publicly available materials, that these digital devices offer their users the ability to unlock the device via the use of a fingerprint, thumbprint, or facial recognition in lieu of a numeric or alphanumeric passcode or password. These features are commonly referred to as biometric authentication and their availability is dependent on the model of the device as well as the operating system on the device. If a user enables biometric authentication on a digital device, he or she can register fingerprints, or his or her face, to unlock that device.

58.    In some circumstances, biometric authentication cannot be used to unlock a device, and a passcode or password must be used instead. These circumstances include: (1) the device has been turned off or restarted; (2) the device has received a remote lock command; (3) too many unsuccessful attempts to unlock the device via biometric authentication are made; (4) too many

hours have passed since the last time the device was unlocked; and (5) the device has not been unlocked via biometric authentication for a period of time and the passcode or password has not been entered for a certain amount of time. Thus, in the event law enforcement encounters a locked digital device, the opportunity to unlock the device via biometric authentication exists only for a short time.

59. The passcode or password that would unlock any devices at the SUBJECT PREMISES is not known to law enforcement. Thus, it is necessary to press the fingers of GOLDBLATT to any phones device's sensor, or hold the phone up to GOLDBLATT's face, in an attempt to unlock the devices for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant device(s) via biometric authentication is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant. I therefore request that the Court authorize law enforcement officers to press the fingers, including thumbs, of GOLDBLATT to the fingerprint sensor of any phones or digital devices equipped with fingerprint authentication, or to hold the device equipped with facial recognition authentication up to GOLDBLATT's face, to unlock the device and thereby allow investigators to search the contents as authorized by this warrant.

## REMOVAL AND FORENSIC IMAGING OF DATA STORAGE DEVICES

60. A forensic image is an exact physical copy of a data storage device. A forensic image captures all data on the subject media without viewing or changing the data in any way. Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of data for information subject to seizure pursuant to the warrant. During a search of

premises it is not always possible to create a forensic image of or search digital devices or media for data for various reasons, including the following:

a.      Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. Because there are so many different types of digital devices and software in use today, it is difficult to anticipate all the necessary technical manuals, specialized equipment, and specific expertise necessary to conduct a thorough search of the media to ensure that the data will be preserved and evaluated in a useful manner.

b.      Searching digital devices can require the use of precise, scientific procedures designed to maintain the integrity of the evidence and to recover latent data not readily apparent to the casual user. The recovery of such data may require the use of special software and procedures, such as those used in a law enforcement laboratory.

c.      The volume of data stored on many digital devices is typically so large that it is generally highly impractical to search for data during the execution of a physical search of premises. Storage devices capable of storing several terabytes of data are now commonplace in desktop computers. It can take several hours, or even days, to image a single hard drive; the larger the drive, the longer it takes. Even portable storage devices such as memory cards and USB and flash drives can have capacities of 256 or 512 gigabytes or more. Depending upon the number and size of the devices, the length of time that agents must remain onsite to image and examine digital devices can make doing an on-site search impractical.

## LABORATORY SETTING MAY BE ESSENTIAL FOR COMPLETE AND ACCURATE ANALYSIS OF DATA

61.     Since digital data may be vulnerable to inadvertent modification or destruction, a controlled environment, such as a law enforcement laboratory, may be essential to conduct a complete and accurate analysis of the digital devices from which the data will be extracted. Software used in a laboratory setting can often reveal the true nature of data. Therefore, a computer forensic reviewer needs a substantial amount of time to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or an instrumentality of a crime.

62.     Analyzing the contents of a computer or other electronic storage device, even without significant technical difficulties, can be very challenging, and a variety of search and analytical methods must be used. For example, searching by keywords, which is a limited text-based search, often yields thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process. The computer may have stored information about the data at issue which may not be searchable text, such as: who created it; when and how it was created, downloaded, or copied; when it was last accessed; when it was last modified; when it was last printed; and when it was deleted. The relevance of this kind of data is often contextual. Furthermore, many common email, database, and spreadsheet applications do not store data as searchable text, thereby necessitating additional search procedures. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed data requires a search of events that occurred on the computer in the time periods surrounding activity regarding

28

the relevant data. Information about which users logged in, whether users shared passwords, whether a computer was connected to other computers or networks, and whether the users accessed or used other programs or services in the relevant time-period, can help determine who was sitting at the keyboard.

63.　　*Latent Data*: Searching digital devices can require the use of precise scientific procedures designed to maintain the integrity of the evidence and to recover latent data. The recovery of such data may require the use of special software and procedures. Data that represents electronic files or remnants of such files can be recovered months or even years after it has been downloaded onto a hard drive, deleted, or viewed via the Internet. Even when such files have been deleted, they can be recovered months or years later using readily available forensic tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in space on the hard drive or other storage media that is not allocated to an active file. In addition, a computer's operating system may keep a record of deleted data in a swap or recovery file or in a program specifically designed to restore the computer's settings in the event of a system failure.

64.　　*Contextual Data*:

a.　　In some instances, the computer "writes" to storage media without the specific knowledge or permission of the user. Generally, data or files that have been received via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to such data or files, and the files are only overwritten as they are replaced with more recently

29

viewed Internet pages. Thus, the ability to retrieve artifacts of electronic activity from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer usage. Logs of access to websites, file management/transfer programs, firewall permissions, and other data assist the examiner and investigators in creating a "picture" of what the computer was doing and how it was being used during the relevant time in question. Given the interrelationships of the data to various parts of the computer's operation, this information cannot be easily segregated.

b.      Digital data on the hard drive that is not currently associated with any file may reveal evidence of a file that was once on the hard drive but has since been deleted or edited, or it could reveal a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, email programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations. Such data may also lead to exculpatory evidence.

c.     Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be learned from the absence of particular data on a digital device. Specifically, the lack of computer security software, virus protection, malicious software, evidence of remote control by another computer system, or other programs or software, may assist in identifying the user indirectly and may provide evidence excluding other causes for the presence or absence of the items sought by this application. Additionally, since computer drives may store artifacts from the installation of software that is no longer active, evidence of the historical presence of the kind of software and data described may have special significance in establishing timelines of usage, confirming the identification of certain users, establishing a point of reference for usage and, in some cases, assisting in the identification of certain users. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations. Such data may also lead to exculpatory evidence. Evidence of the absence of particular data on the drive is not generally capable of being segregated from the rest of the data on the drive.

## SEARCH PROCEDURE

65.    In searching for data capable of being read, stored, or interpreted by a computer or storage device, investigators executing the search warrant will employ the following procedure:

a.     On site search is not available as the SUBJECT TELEPHONE is already in law enforcement custody and GOLDBLATT is currently detain on state charges. The digital device will be transported from Lehi Police Department to HSI's custody and to an appropriate law enforcement laboratory for review.

31

b. *Manual review of devices may be necessary.* Some applications installed on devices or data stored on devices may not be able to be forensically imaged or viewed. Such factors may include but are not limited to unique encryption applications or protocols, installed digital rights management services (DRM) to restrict a device or protect content, or customized or beta versions of applications. In such cases this data will be be reviewed or obtained via a manual search of the device where an investigator operates device in the same way that an owner or other user would.

c. Investigators will examine the digital device to extract and seize any data that falls within the list of items to be seized as set forth in the warrant and in Attachment B. To the extent they discover data that falls outside the scope of the warrant that they believe should be seized (e.g., contraband or evidence of other crimes), they will seek an additional warrant.

d. Investigators will use procedures designed to identify items to be seized under the warrant. These procedures may include the use of a "hash value" library to exclude normal operating system files that do not need to be searched. In addition, investigators may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data falls within the list of items to be seized under the warrant.

e. In order to conduct a thorough search for inculpatory and exculpatory evidence, investigators may need to review evidence over time or with various forensic tools. It is impractical for the government to review the forensic data from each device simultaneously. Moreover, various pieces of evidence recovered from digital devices may have unknown probative value until they are considered within the context of additional

evidence found in the ongoing investigation. In order to comprehend the facts in sum, investigators will maintain access to all evidence and may need to reexamine any particular piece of evidence as it was originally preserved.

f.      If an original digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will return that original data device to its owner within a reasonable time following the search of that original data device and will seal any image of the device, absent further authorization from the Court.

## RETENTION OF IMAGE

66.      The government will retain a forensic image of each electronic storage device subjected to analysis for a number of reasons, including proving the authenticity of evidence to be used at trial; responding to questions regarding the corruption of data; establishing the chain of custody of data; refuting claims of fabricating, tampering with, or destroying data; and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

33

## CONCLUSION

67.    Based upon the foregoing, I have probable cause to believe that Zalman Ber

GOLDBLATT committed the SUBJECT OFFENSES and that contraband and evidence, fruits,

and instrumentalities of those violations, as described in Attachment B, will be located in the

SUBJECT TELETPHONE, as described in Attachment A.


_/s/ Sergio Guerra_____
Sergio Guerra
Special Agent
Homeland Security Investigations


Sworn to before me telephonically or by other reliable means pursuant to Fed. R. Crim.

P. 4.1 at 3:30 pm on April 28, 2025.

_____
HONORABLE DUSTIN PEAD
United States Magistrate Judge

34

**ATTACHMENT A**

**PROPERTY TO BE SEARCHED**

The SUBJECT CELLPHONE to be searched is a black Android cell phone, seized from Zalman Ber GOLDBLATT's person at the time of his arrest on February 28, 2025. The cellphone is currently in the possession of the Lehi, Utah Police Department in Lehi, Utah and will be transferred to custody of HSI Salt Lake City, Utah.

**ATTACHMENT B**

**LIST OF ITEMS TO BE SEIZED AND SEARCHED FROM THE PROPERTY**

**DESCRIBED IN ATTACHMENT A**

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use, or which is or has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. § 2423(b) (Travel with Intent to Engage in Illicit Sexual Conduct), 18 U.S. Code § 2422 (Enticement/Coercion of a Minor): 18 U.S. Code § 2252A (Transportation of Child Pornography,  18 U.S.C. § 2251(a) (Production and Attempted Production of Child Pornography), and 18 U.S.C. §§ 2252(a)(4) and 2252A(a)(5)(B) (Possession of Child Pornography), ("collectively the SUBJECT OFFENSES") and are contained in the SUBJECT CELLPHONE:

1. Records, information, and items relating to violations of the statutes described above including:

    a. Any communications with any minor, including the MINOR and MINOR VICTIM 1;

    b. Any records indicating the use of Chat Applications A, B, and C[44];

    c. Any records tending to identify the individual communicating with the MINOR and/or MINOR VICTIM 1 on Chat Applications A, B, and C;

    d. Any records tending to identify anyone using the username Tim on Chat Applications A, B, and C;

    e. Any records tending to identify anyone using the username username/emoji

---

[44] The true names of Chat Applications A, B, and C are known to law enforcement and will be provided to any person executing this search warrant.

depicting a purple smiley face with horns on Social Media Platform A;

f. Any records tending to identify the location of the person communicating with MINOR, including but not limited to any records tending to establish whether that person crossed state lines to meet MINOR;

g. Any photographs sent from MINOR to GOLDBLATT;

h. Any photographs sent from GOLDBLATT to MINOR;

i. Any photographs or videos sent from GOLDBLATT to MINOR VICTIM 1;

j. Any photographs or videos depicting MINOR VICTIM 1, including but not limited to the VIDEO described above;

k. Any record tending to identify the location of the SUJECT TELEPHONE at the time the VIDEO of MINOR VICTIM 1 was taken;

l. Child sexual abuse material (CSAM, to include child pornography);

m. Images or depictions, whether written or visual of minors;

n. Child erotica;

o. Records, software, documents, correspondence, or information, in any format and medium, relating to a sexual interest in children;

p. Records, software, documents, correspondence, or information, in any format and medium, relating to the sexual abuse of a child;

q. Records, software, documents, correspondence, or information, in any format and medium, to identify minors, including minors GOLDBLATT may have interacted with;

r. Records and information tending to identify or locate persons suspected of violating

the statutes described above;

s.  Records and information tending to identify or locate any children depicted in CSAM or suspected of being sexually exploited in any way;

t.  Records and information relating to the sexual exploitation of children, including correspondence and communications between messaging platform users, access to social media and chat applications;

u.  Records and information concerning membership in online groups, clubs, or services that provide or make accessible CSAM, or offer children for sexual encounters; and

v.  Records, information, credit card information, bills, and payment records pertaining to advertising for sale, selling, distributing, receiving, possessing, storing, or viewing CSAM;

2.  Evidence of who used, owned, or controlled the SUBJECT CELLPHONE at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

a.  Evidence indicating how and when the SUBJECT CELLPHONE was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the SUBJECT CELLPHONE user;

b.  Evidence indicating the SUBJECT CELLPHONE user's knowledge and/or intent

as it relates to the crime(s) under investigation;

    c.  Evidence of the SUBJECT CELLPHONE locations or the intended locations of the SUBJECT CELLPHONE user, including geolocation data, navigation data, data pertaining to location from applications installed on the phone, and other geographic data;

    d.  Evidence of the attachment to the SUBJECT CELLPHONE of other storage devices or similar containers for electronic evidence;

    e.  Evidence of the times the SUBJECT CELLPHONE was used;

    f.  Records of or information about Internet Protocol addresses accessed by the SUBJECT CELLPHONE;

    g.  Records of or information about the SUBJECT CELLPHONE's internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

    h.  Contextual information necessary to understand the evidence described in this attachment;

3. Evidence of the presence or absence of software that would allow others to control the SUBJECT CELLPHONE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    a.  Evidence of programs (and associated data) that are designed to eliminate data from the SUBJECT CELLPHONE;

During the execution of the search of the SUBJECT CELLPHONE described in **Attachment A**, law enforcement personnel are also specifically authorized to compel GOLDBLATT to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of the SUBJECT CELLPHONE.

This warrant does not authorize law enforcement personnel to compel from GOLDBLATT the password or any other means that may be used to unlock or access the SUBJECT CELLPHONE, as described in the preceding paragraph.